**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

RODNEY SWEARENGIN,               )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )          No. 4:22-CV-403 SRW
                                 )
CHRIS CHAMBERLAIN, et al.,        )
                                 )
          Defendants.            )

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court upon the motion of plaintiff Rodney Swearengin, a civil detainee, for leave to commence this action without payment of the required filing fee. Plaintiff has also filed a motion for appointment of counsel and seeks injunctive relief in the body of his complaint. After reviewing plaintiff's complaint, the Court will dismiss plaintiff's action pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiff's motion for appointment of counsel and request for injunctive relief will be denied as moot.

**Legal Standard on Initial Review**

Under 28 U.S.C. § 1915(e)(2), the Court is required to dismiss a complaint filed in forma pauperis if it is frivolous, is malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. To state a claim for relief, a complaint must plead more than "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct." *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Determining whether a complaint

states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

When reviewing a *pro se* complaint under 28 U.S.C. § 1915, the Court accepts the well-plead facts as true, *White v. Clark*, 750 F.2d 721, 722 (8th Cir. 1984), and liberally construes the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A "liberal construction" means that if the essence of an allegation is discernible, the district court should construe the plaintiff's complaint in a way that permits his or her claim to be considered within the proper legal framework. *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015). However, even *pro se* complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980). *See also Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004) (refusing to supply additional facts or to construct a legal theory for the *pro se* plaintiff that assumed facts that had not been pleaded).

## Background

Plaintiff Rodney Swearengin is a civilly committed resident at the Sex Offender and Rehabilitation Treatment Services Center (SORTS) which is run by the Missouri Department of Mental Health in Farmington, Missouri. Plaintiff was declared a sexually violent predator under Missouri's Sexually Violent Predator Act, Mo. Rev. Stat. §§ 632.480 – 632.513, on August 27, 2014, by a unanimous jury verdict in Greene County, Missouri. *In re Rodney Swearengin*, No. 1031-PR00453 (31st Judicial Circuit, Green County Court).

According to Missouri Case.net, the State of Missouri's online docketing system, plaintiff was incarcerated with the Missouri Department of Corrections prior to his civil commitment. On July 31, 2006, plaintiff was charged with the class C felony of sexual misconduct with a child under the age of fourteen. Plaintiff entered a plea of guilty pursuant to an Alford plea. The charge was amended to attempted sexual misconduct with a child under fourteen. Plaintiff was

sentenced to four years of imprisonment in the Missouri Department of Corrections. *See State v. Swearengin*, No. 06AE-CR02902 (6ᵗʰ Judicial Circuit, Platte County Court).

**The Complaint**

Plaintiff brings a fifty-seven (57) page complaint before the Court pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights. He names sixteen (16) individuals and entities as defendants in this action: Chris Chamberlain (Security Chief); Misty Kindle (Nurse Practitioner); Stacey Gegg (Social Worker); Madison Nohren (Social Worker); George Killian (Counselor); Jared Hoskins (Security Aide); Denny Farmer (Security Aide); Jeff Cunningham (Security Aide); Jane Doe (Nurse Supervisor); John Doe (Security Aide); Dr. Kimberly Bye (Psychologist); Missouri Department of Mental Health; Southeast Missouri Mental Health Center; Denise Hacker (COO); Kathy Hammond (Nurse Practitioner); and Charles McIntyre (Grievance Coordinator). Plaintiff sues the individual defendants in their individual capacities only.

Plaintiff alleges that during an approximate seven-month period, between late August of 2021 and early March of 2022, he was civilly detained at SORTS in Farmington, Missouri, when he purportedly began to suffer violations of his civil rights. He asserts that he was subjected to two "strip searches," had his room searched multiple times, had personal property taken away, was subjected to an instance of excessive force and deliberate indifference of his medical needs, as well as a conspiracy to violate his rights and harassment. Plaintiff also alleges that his grievances at SORTS were not properly processed, and he lost liberty interests when his treatment levels were reduced. Plaintiff asserts that the supervisory employees at the Missouri Department of Mental Health unlawfully failed to promulgate policies at SORTS that protected detainees, and instill those policies in their subordinates, such that due process guidelines were not followed for detainees.

### A. Strip Search on August 20, 2021

Plaintiff first claims that on August 20, 2021, he was subjected to a "strip search" by defendant Chris Chamberlain. He states that Security Chief Chamberlain came to his room, along with Nurse Misty Kindle and Social Worker Stacey Gegg, and told plaintiff that a fellow patient or staff member had indicated that plaintiff was concealing a flash/junk drive with music on it. Defendants first asked plaintiff to consent to submit to a strip search. Plaintiff claims that he initially declined to submit to the search, even though he was told by defendant Kindle that the order for the search came from an individual in "Administration" located in Jefferson City whom he identifies as, Jane Doe, and that the search would be done within the Missouri Department of Mental Health policy. Plaintiff claims in his complaint that he believes the orders came from defendants Psychologist Kimberly Bye and Chief Operating Officer Denise Hacker. However, he does not indicate how he came to believe this information.

Plaintiff asserts that after reviewing the Department of Mental Health policy, he did not agree that the search was necessary, but he was "coerced" to agree to the search by defendant Kindle, who told him he could lose his "treatment objectives" if he failed to allow the search. Plaintiff states that Kindle also told him he could be put on Total Ward Restriction, as well as lose his ability to maintain his job at SORTS if he failed to agree to the search. Thus, plaintiff submitted to the strip search in his room by Security Chief Chamberlain, Security Aide Denny Farmer, Security Aide John Doe, as well as Security Aide Jeff Cunningham. All these individuals are named defendants in this action.

During the strip search, plaintiff was asked to "bend over, spread his anus/bottom, and raise his scrotum so that defendant Chamberlain could examine plaintiff's privates. Plaintiff was not touched by defendants. Plaintiff's room was then immediately searched after his person. However, no contraband was found in either plaintiff's room or on his person. After the search,

defendant Kindle told plaintiff that it would be charted that he had cooperated in the search and that nothing was found in his possession.

### B.  Room Searches and Removal of Property

Plaintiff purports that on January 28, 2022, Security Aide Jared Hoskins, John Doe Security Aide, and Security Aide Tony Morgan[1] were called by an unnamed person to plaintiff's room to do a room search. Plaintiff does not indicate why these individuals were called to plaintiff's room on January 28, 2022, to do a room search.

Plaintiff states that these individuals removed the following property from his room on that date: (1) a paper bag with clothes; (2) CD player; (3) headphones plaintiff already had bagged up ready to go to property; (4) three zip-up bags for art pens; (5) two bags plaintiff was keeping for hand-held video games; (6) two hand-held video games plaintiff had in paper bags ready to go to property.

Plaintiff was told by defendant Hoskins that he was not allowed to keep his art pens in the zip-up bags, and that he needed to relinquish some of his hand-held video games to the property room. Plaintiff and defendant Hoskins argued about plaintiff's security level and ability to have the hand-held video games. Plaintiff also pointed out to Hoskins that the zip-up bags were on the "Basic Items List," and should be able to be used for art supplies. Thus, on January 29, 2022, plaintiff grieved the zip-up pen bag with defendant Chamberlain, who replied that the pen bag was on the "Basic Items List." Although it appears that defendant Chamberlain agreed with plaintiff as to the zip-up bag issue, plaintiff does not indicate whether the art supplies were eventually returned to his room. He does indicate, however, that a couple of stamps "came up missing" after some of his property was taken to the property room by defendant Hoskins on January 28, 2022.

---

[1] Tony Morgan has not been named as a defendant in this lawsuit.

Plaintiff complains that a total ward search was conducted by the Security Team while all SORTS detainees were in the dayroom at 12:30 p.m. on February 9, 2022. Plaintiff alleges that defendant George Killian, Counselor, searched his personal area on that date. He claims that defendants Chamberlain and Killian removed from his room a personal stereo because of an altercation plaintiff had previously had with another detainee. Approximately an hour after the search, plaintiff alleges that he asked defendant Chamberlain for a list of what was taken from his area and why. Plaintiff was told he would be provided with a list after "an investigation." However, another ward search occurred around 4:30 that afternoon, at which time plaintiff asserts that two desks were removed from his room. Plaintiff was told by another detainee that he had heard that defendant Chamberlain had gotten evidence from another detainee that plaintiff had modified batteries in his hand-held games, which was causing concern.

On February 10, 2022, plaintiff was called to the conference room in front of defendants Kindle and Chamberlain, and he was asked as to how he took screws out of the battery compartments of his hand-held games to place his initials on the batteries inside. Plaintiff was made to hand over his I.D., and defendant Chamberlain noticed that his I.D. was filed to a flat surface with the clip bent. Plaintiff explained that at times patients' electronic items are left unattended while they are in the charging station and items can get mixed up.

On February 10, 2022, as plaintiff was walking in from the yard with two detainees, defendant Chamberlain told another security officer to do a pat-down search on plaintiff prior to going into the restroom. When plaintiff questioned why he was being subjected to a pat-down search, defendant Chamberlain said he "wants" to. However, plaintiff's privileges were reduced to "Red Privilege" on that same day, and he was given a behavior worksheet for "Dangerous

Contraband" by defendant Chamberlain for items found in plaintiff's room search.[2] Defendant Chamberlain told plaintiff that "Administration confirmed past behavior with batteries and fire related to his hand-held game so that [he] will not be getting the hand-held games back and the games will be facility property for contraband." Defendant Chamberlain told plaintiff that part of the "Red Privilege" included not being able to possess or use chewing gum or possess or use electronic items.[3]

On February 14, 2022, plaintiff spoke to several individuals in the property room at SORTS about returning his "monthly package" because his privilege levels had been reduced. He was told that the issue would have to be taken to defendant Chamberlain. On February 18, 2022, plaintiff was asked to sign a "disposal sheet" listing several items that were considered altered or damaged. Plaintiff states that he asked defendant Chamberlain if he could send the items on the "disposal sheet" home, but Chamberlain told him that SORTS' procedure was to dispose of the items. Plaintiff asked that the electronics be sent to an outside consultant to be evaluated for a "fire risk." Defendant Chamberlain refused plaintiff's request.

Plaintiff alleges that between February 18, 2022 and February 23, 2022, his room and/or area was searched eighteen (18) times because he was on "close observation." He was placed on

---

[2]Plaintiff states that some of the items listed on the Behavior Worksheet for "Dangerous Contraband" included: (1) deliberately hiding face of watch in headphones between earpads; (2) all six of plaintiff's hand-held video games had scratches on the batteries; (3) two pair of diamond stud earrings were hiding in the headphone cord when pulled out of the headphones with wires exposed. Plaintiff states that there was other property seized from his room, including: (1) gaming replacement pads; (2) medical tape; (3) new earbuds; (4) a CD player/personal stereo system; (5) two pieces of clothing with no strings attached; (6) one "altered" CD; (7) an alarm clock; and (8) razor; (9) 6 hand-held video games; (10) two pairs of earrings; (11) watch; (12) 3 pairs of headphones; (13) 3 earbuds; (14) 2 wire-splitters; (15) wire extension; (16) portable cassette player; (17) 2 power adaptors; and (18) 3 Blick art bags.

[3]Other losses in privileges plaintiff claims he received when he dropped from "Green Level" to "Red Level" included: (1) reduced to 4 books from 10; 2) reduced to 3 CDs from 30; (3) must have 2 escorts rather than 1; (4) must be in bedroom at lights out, previously could be in dayroom; (5) reduced to 1 hour privilege time from 4 hours; (5) reduced to 4 canteen accesses from unlimited; (6) reduced to no food during visits from 12 per year; (7) reduced to no-contact visits; (8) reduced to bi-monthly $75 package allowance from $250; (9) loss of gainful employment work program.

restrictions on February 23, 2022, including: no chewing gum; no watch; no batteries; no

electronics; no clock; and no radio. Plaintiff was also restricted from using the common property

of his ward, including: the ward radio; ward hand-held games; and ward PlayStation. Plaintiff

claims that he fell from Treatment Phase III to Treatment Phase I during this time. Plaintiff states

that he was released from "close observation" on February 23, 2022.

### C. Allegations of Excessive Force as to Defendant Chamberlain and Strip Search on February 15, 2022

On February 15, 2022, plaintiff alleges that Security Chief Chamberlain, Security Aide

Cunningham, Nurse Rebecca McCauley and Security Aide Steve Philbert[4] called plaintiff to his

room. Plaintiff states that defendant Chamberlain told him that he was going to conduct a strip

search at that time, and he asked Nurse McCauley to block the room window. Because Nurse

McCauley was not tall enough to block the window, she purportedly left the room to get a taller

staff person to do so.[5] Defendant Cunningham was videotaping the search.

Plaintiff states that at first, he refused to consent to the strip search, but when defendant

Chamberlain indicated that force would be used if he refused to comply, he acquiesced and took

off his shorts and underwear. Inside plaintiff's underwear was a packet of smokeless chewing

tobacco. Defendant Chamberlain inspected the tobacco and dropped it on the floor near

plaintiff's feet.

Plaintiff claims that he was told to lift his scrotum and penis, and at this point he was

standing naked in front of Rebecca McCauley and noticed two patients looking through the

---

[4]Nurse Rebecca McCauley and Security Aide Steve Philbert have not been named as defendants in this action.

[5]The complaint is not clear as to whether Rebecca McCauley was in the room during the entirety of the strip search with plaintiff. At one point plaintiff indicates that Nurse McCauley left the room to get a taller staff person, while at another point he states that he was made to strip down in front of Nurse McCauley.

window. He alleges that he "became uncomfortable," and "bent down and attempted to pick up his underwear on the floor." Plaintiff claims that when he bent down to grab his underwear, defendant Chamberlain "stomped" on plaintiff's right hand and pinned it to the floor until plaintiff jerked it out from under his foot. Although plaintiff indicated in his complaint that he was grabbing his underwear, it is clear that he also grabbed the tobacco at the same time, as plaintiff admits in his complaint that he had the chewing tobacco in his hand at the time Chamberlain "stomped" on his hand. Plaintiff states that when he "snatched the smokeless chew in his hand" he asked Chamberlain, "What are you going to do now?"

Plaintiff purports that a Code-10 was called, and female Security Aide Heather Ziegelmeyer entered plaintiff's room, leaving the door wide open. He asserts that he was "forcibly pinned to the floor on his knees and forehead." However, plaintiff fails to indicate which defendants pinned him to the floor, putting "pressure on his neck and back."

After the incident, defendant Chamberlain placed plaintiff on a 2:1 observation detail. Plaintiff does not indicate how long the detail lasted or how this affected his due process rights.

**D.  Allegations of Deliberate Indifference to Serious Medical Needs**

Plaintiff alleges that pictures of his hand were taken by defendant Cunningham at 8:05 a.m. on February 15, 2022. Cunningham told plaintiff to ask Nurse Bambi Miller to take "infection control pictures" as well. However, plaintiff complains that Nurse McCauley failed to give him an assessment, as did Nurse Jane Doe on that date. He does not indicate whether Nurse Miller took the pictures that defendant Chamberlain requested.

Plaintiff states that in the middle of the night on February 16, 2022, he attempted to get out of bed to use the restroom, and he "could hardly move." Plaintiff does not articulate his alleged injuries, merely stating that he was "straining to get up," and that he was unable to make it to the restroom. He claims he took what pain medication he had at the time, Excedrin, and he

went back to bed. Early that morning he asked Nurse McCauley for pain medication, and she told him she would need a doctor's order to bring him oral medication. However, she ordered Ben-Gay for his back, which he would need to pick up at the medication window. Later that evening, Rebecca McCauley filled out a medication request form for plaintiff to get oral pain medication for his back and hand. He was given the medication the next morning, February 17, 2022, at 5:15 a.m.

Plaintiff claims that he was seen by an unnamed nurse on February 17, 2022, and the nurse noted problems with swallowing. It was concluded it could be that he was allergic to the Ibuprofen he was taking for his back. Thus, on February 18, 2022, Nurse Hall notified medical and attempted to get a new medication for plaintiff. Plaintiff states that Nurse Dan Forsythe checked with medical on the afternoon of February 18, 2022, regarding a substitution, but he did not hear back from him. As a result, plaintiff simply stopped taking the Ibuprofen and his swallowing issues stopped.

Plaintiff alleges that defendant Kathy Hammond has failed to respond to his request for treatment for his hand. However, he admits that defendant Hammond prescribed him 600 mg of Ibuprofen every 8 hours for pain at some point for pain because of the incident.

Plaintiff asserts that Jane Doe nurse failed to order a post-trauma assessment for plaintiff after his hand was stepped on by defendant Chamberlain, and he suffered an injury to his back. However, plaintiff has failed to articulate when he asked Jane Doe nurse for a trauma assessment, and what Jane Doe nurse told him.

**E.  Conspiracy Claims**

Plaintiff asserts that counselor, Rebecca Deason, spoke to him in December 2021, as part of her resignation process from SORTS. He claims that Ms. Deason told plaintiff that "[d]efendants Kindle and Gegg, in active conspiracy, were 'out to get [plaintiff],' and he should

do everything he can to leave Hoctor 4 Ward." Plaintiff fails to go into detail regarding this alleged warning. Rather, plaintiff merely states that Ms. Deason told him he would be "safer" in another ward, and there would be less drama.

Plaintiff alleges that defendants Chamberlain, Cunningham, Kindle, Gegg, Hoskins, Hohren, Killian, Farmer, John Doe and Hacker conspired with one another to deny plaintiff procedural and substantive due process by searching, seizing, and or damaging plaintiff's personal property. He claims that defendant Killians and Hacker gave defendant Chamberlain permission to carry out his plan. And that defendant Chamberlain "orchestrated" the other defendants to seize all of plaintiff's electronic items without a warrant. Plaintiff claims that defendant Cunningham provided "muscle" and "intimidation," while defendant Kindle provided "necessary medical signatures." Plaintiff additionally claims, in a conclusory manner, that defendants Gegg and Nohren provided "therapeutic intimidation" and "threats to reduce Phases of Treatment level." He claims defendant Hoskins, Farmer, John Doe and Killian also joined in the warrantless searches, while Killian "took on the role of primary group therapist to try to coerce confessions of guilt from plaintiff.

**F. Loss of Liberty Interest as A Result of Loss of Treatment Level**

Plaintiff complains that dropping him from a Phase III Treatment Level to a Phase I Treatment Level was a loss of liberty interest. He asserts that Missouri Revised Statute § 630.115(11) states, "Each patient, resident, or client shall be entitled to the following without limitation: To be evaluated, treated or habilitated in the least restrictive environment…"

He asserts that pursuant to the Missouri Code of Regulations, 9 C.S.R. 40-1.065 (1)(B), "Each individual receiving services is entitled to the following without limitations: To medical care and treatment in accordance with the highest standards accepted in medical practice to the extent available at the community resident program or day program…" And "[p]olicies and

procedures shall not be developed that limit the individual rights identified in this rule." 9 C.S.R. 40-1.065(4).

Plaintiff asserts that reduction of his treatment levels based on his behavior worksheets and not on his sex-offense conduct or thinking has denied him a liberty interest. He believes that "proper standard of care" should include such things as: (1) routine medical care; (2) emergent medical care; (3) post-trauma assessment; (4) stress management and de-escalation training; (5) psychiatric and psychological help and treatment; (6) skills training for successful community reintegration.

### G. Failure to Process Grievances

Plaintiff alleges that when his electric razor was seized by defendant Chamberlain on February 28, 2022, he contacted Grievance Coordinator Charles McIntyre to "go to defendant Chamberlain's office to supervise defendant Chamberlain [when he inspected] plaintiff's electric razor." Plaintiff states that he feared his razor would be altered by defendant Chamberlain, and then seized. However, on that same date, Security Aide Shawn Unknown, brought plaintiff's razor back and asked plaintiff to examine his razor in front of Security Aide Steve Philbert and Jeremy Crice. Plaintiff turned on the razor and it was making grinding noises. Plaintiff states that the razor was taken back to defendant Chamberlain to "tighten the screws." However, the razor bag was brought back to plaintiff without the razor. Defendant Chamberlain told Security Aide Shawn Unknown to tell plaintiff the razor had been altered or damaged and plaintiff would not be getting it back.

On March 1, 2022, plaintiff contacted Charles McIntyre who indicated he was present when defendant Chamberlain turned the razor on and there was nothing wrong with the razor. McIntyre indicated he would have defendant Chamberlain get the razor replaced. Nonetheless, plaintiff claims that on March 2, 2022, plaintiff received a "non-permitted item notice" for the

razor that indicated "item was altered/screw had tape on the end." Plaintiff does not indicate if his razor was replaced as Charles McIntyre indicated.

Plaintiff asserts that McIntyre should have advocated for him to have a "confrontational and evidentiary hearing" prior to having the loss of privileges placed on him. However, plaintiff does not indicate exactly which loss of privileges he is referring to, and he has not indicated that he filed grievances relative to any of the instances alleged in the complaint except for the alleged incident with defendant Chamberlain and the razor.

Plaintiff complains that SORTS has an inexhaustible grievance procedure because SORTS and the Missouri Department of Mental Health fails to exercise oversight over the grievance procedure and publish grievance procedure rules in line with due process. He further alleges that McIntyre "holds conflicting offices" and authorities at SORTS, as both the Grievance Coordinator, as well as the Patient Rights Advocate and Rights of the Individual Committee Chairperson.

Plaintiff claims that in McIntyre's second job, he merely advocates for the hospital, not the patient. However, as the Grievance Coordinator, when a patient files a grievance, McIntyre speaks to the patient's team, Program Coordinator and the Unit Manager in order to gather information for the initial response. If the patient disagrees with the initial response, defendant McIntyre takes the grievance to the Rights Committee. And the Rights Committee then determines if the grievance states a patient rights violation. Plaintiff asserts that no appeals of grievances are allowed if the Rights Committee finds no violation.

Plaintiff alleges that McIntyre and the Rights Committee only recognizes 46 "patient rights" which are cobbled together from 4 sources: Joint Commission on Accreditation of Healthcare Organization standards, Medicaid and Medicare Standards, and two statutes. Plaintiff does not indicate where he has found this information.

**H. Allegations of Harassment**

Plaintiff asserts that even after he was taken off "close observation" he was continuously harassed by Security Aides at SORTS.

Plaintiff states that when he was on a "fresh air break" on March 4, 2022, he found a set of hearing aids, and he turned them into Security Agent Denny Farmer on March 5, 2022. Plaintiff was interviewed by defendant Chamberlain about the hearing aids on March 7, 2022, and he was told that he would receive a "Behavior Worksheet" for having them in his possession because he was not allowed to have electronics and because he did not turn them in until the following day.

Plaintiff states that he was called to the back laundry room in the afternoon of March 7, 2022, by Security Aides Hoskins, Shawn Unknown, John Doe, and Nurse Sara Purkett and asked where the batteries were to the hearing aids. When plaintiff told them there were no batteries with the hearing aids when he found them, he was taken to his room and a metal detector was used to determine if he was concealing the batteries. He was then pat searched. Plaintiff's room was then searched by Hoskins, Philbert John Doe and Shawn Unknown. Plaintiff states that once again his privilege levels were dropped. Plaintiff has not indicated what "privilege level" he was dropped to with regard to this incident.

**I. Failure to Promulgate Policies**

Plaintiff alleges in a conclusory manner that defendants should be liable for failing to promulgate "patient property protection policies," "search warrant protection policies," and other "patient property safeguards." He additionally claims that the Missouri Department of Mental Health is responsible for failing to "promulgate and publish policies regarding the legal and appropriate restrictions applicable for long-term residential hospital patients." Plaintiff holds

- 14 -

supervisory defendants Hacker, Killian, Gegg, Nohren, Chamberlain and McIntyre responsible for this.

Defendant alleges in a conclusory manner that defendants Kimberly Bye, George Killian and Denise Hacker should be held liable under a failure to train theory for his alleged strip searches because he believes that the strip searches were carried out without disregard for due process. He also alleges that defendants Hacker, Killian and Chamberlain should be held responsible under a "failure to train" theory for failing to train subordinates under them with respect to "evidentiary due process" hearings, rather than taking privileges away through internal memoranda, vocal directives or unpublished policies.

**J.   Plaintiff's Requested Relief**

Plaintiff seeks a temporary restraining order from this Court requesting that defendant Chamberlain have "no contact" with him.[6] He also seeks declaratory relief seeking a finding from this Court indicating that defendants violated his due process rights by conducting warrantless searches of his room and person, seizing his property, and "implementing punitive restrictions" against him. Plaintiff further seeks a finding from this Court that the supervisory defendants failed to adequately train their subordinates in carrying out their duties.

Plaintiff additionally seeks an order from this Court that Missouri Department of Mental Health employees wear body cameras when conducting searches, fill out chain of custody receipts, obtain proper search warrants, establish due process hearings for processing behavior worksheets, including a right to appeal findings, provide residents at SORTS a least restrictive environment, and replace detainees seized and/or damaged property. Plaintiff also asks for a mandatory injunction as to how rules and policies are to be promulgated at SORTS.

Last, plaintiff seeks monetary damages in an amount over one million dollars.

---

[6]Plaintiff has not filed a separate motion for temporary restraining order.

**Discussion**

**A.  Procedural and Substantive Due Process Allegations**

Liberally construing plaintiff's pleadings, this is a civil rights action brought under 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the United States Constitution or created by federal statute and must show that the alleged deprivation was caused by conduct of a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The Eighth Amendment to the Constitution prohibits the infliction of cruel and unusual punishment and applies to the states through the Due Process Clause of the Fourteenth Amendment. *Baze v. Rees*, 553 U.S. 35, 47 (2008). "However, because an involuntarily committed psychiatric patient is confined for treatment rather than incarcerated for the purpose of punishment following conviction, the Eighth Amendment does not apply." *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004). "The rights of patients in psychiatric hospitals more appropriately arise under the Fourteenth Amendment." *Id*.

The Due Process Clause of the Fourteenth Amendment prohibits state governments from depriving "any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. "This clause has two components: the procedural due process and the substantive due process components." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (en banc) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)). "Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated, and the possession of a protected life, liberty, or property interest is a condition precedent to any due process claim." *Id*. Substantive due process rights are created only by the Constitution, while procedural due process rights can be created by either state law or the Constitution. *Id.*

In this case, plaintiff alleges he had a protected interest in the following: (1) his personal property; (2) a least restrictive environment at SORTS; (3) creation of specific due process policies at SORTS and the Department of Mental Health; (4) evidentiary hearings prior to reduction in treatment levels; (5) protection from warrantless strip searches, excessive pat down searches and room searches; and (6) an exhaustible grievance policy. The Court will address each of plaintiff's contentions in turn.

**1. Plaintiff's Allegations Regarding the Loss of Personal Property**

Property interests are not created by the Constitution. "Rather they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577. But "federal constitutional law determines whether [a property] interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *McGuire v. Indep. Sch. Dist. No. 833*, 863 F.3d 1030, 1034 (8th Cir. 2017) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005)).

Reviewing the complaint as a whole, on January 28, 2022, during a room search, plaintiff was found with items in his room that he was not allowed to have, pursuant to SORTS regulations. Although plaintiff asserted that he was allowed to have the items, his items were taken and placed in the property room at that time. Those items included two hand-held video games and three zip up bags containing art pens. Although plaintiff argued with defendant Hoskins that the art pens were allowed on his Basic Items List, he was told that those items were supposed to be kept behind the nurse's station.

During a ward search on February 9, 2022, plaintiff's stereo was taken as well, and on February 10, 2022, plaintiff was told by defendants Chamberlain and Kindle that they had

noticed he was marking up batteries with his initials, using the clip on his I.D., which was not allowed. On that same day, plaintiff was given a Behavior Worksheet for Dangerous Contraband for items found in his room search and he was told that he would not be getting his hand-held games back because of his past behavior with the batteries which had previously caused a fire in 2018.

On February 14, 2022, in a meeting with defendant Killian, plaintiff received another Behavior Worksheet indicating that he had been found to be hiding earrings in his headphones and all six of his hand-held games had scratches on the batteries. Plaintiff had also been found to be hiding a watch in his earpads of his headphones, and the wires were exposed on a pair of headphone cords. Defendant Killian told plaintiff at that time that his behavior was like prior behavior in 2018, and that it appeared that he was not improving in following directions. Plaintiff was reduced from a Green Level to a Red Level at that time.

Despite this warning from defendant Killian, on February 15, 2022, plaintiff was found hiding smokeless chewing tobacco in his underwear during a strip search. On February 18, 2022, plaintiff was given two additional Behavior Worksheets for confiscated items that he was not allowed to have. On that same date, defendant Chamberlain notified plaintiff that he was not allowed to possess electronics of any kind. Thus, plaintiff's alarm clock and CD player were taken. In total, plaintiff claims that the following was removed from his property and not returned: (1) gaming replacement pads; (2) medical tape; (3) new earbuds; (4) a CD player/personal stereo system; (5) two pieces of clothing with no strings attached; (6) one "altered" CD; (7) an alarm clock; and (8) razor; (9) 6 hand-held video games; (10) two pairs of earrings; (11) watch; (12) 3 pairs of headphones; (13) 3 earbuds; (14) 2 wire-splitters; (15) wire extension; (16) portable cassette player; (17) 2 power adaptors; and (18) 3 Blick art bags.

A review of the complaint indicates that plaintiff contested his guilt several times to defendants Chamberlain, Killian, Kindle, Hoskins, Gegg, Nohren, Farmer and John Doe, prior to being issued the Behavior Worksheets. Although he admits that he also had the ability to file grievances regarding the issue with Charles McIntyre, it does not appear that he did so. Nonetheless, he asserts that his property was taken from him without due process. Plaintiff admits that SORTS has a grievance procedure, however, he states that the only matter he grieved with Charles McIntyre, the grievance coordinator, was the loss of his razor. McIntyre told him that he would have his razor replaced. It is unclear from the record if plaintiff did receive a new razor from McIntyre or not.

To the extent plaintiff alleges a constitutional violation for restricting or limiting him access to his personal property, such a claim is subject to dismissal. Persons committed to the state's custody by means of a civil proceeding retain liberty interests in essential care items such as adequate food, shelter, clothing, and medical care. *See Youngberg v. Romeo*, 457 U.S. 307 (1982); *see also Kennedy v. Schafer*, 71 F.3d 292, 294 (8th Cir. 1995) (noting that involuntarily committed persons unquestionably have a protected liberty interest in a safe and humane environment).

Here, plaintiff does not allege he has been denied any essential care items. To the contrary, he alleges a denial of access to non-essential care items only, such as a DVD player, video games, his personal art supplies, and electronics. These are non-essential items, and the Court cannot find that any such denial or restriction rises to the level of a violation of his constitutional rights.

Moreover, although the due process clause may be implicated when a detained individual suffers a loss of property, if the taking of property is intentional and the state provides an adequate post-deprivation remedy, there is no violation of due process. *Hudson v. Palmer*, 468

U.S. 517, 530-36 (1984) (availability of damages remedy in state claims court is an adequate, post-deprivation remedy); *see also McGee-El v. Hartegan*, 2008 WL 5071107, at *2 (E.D. Mo. Nov. 24, 2008) ("There is no cause of action under 42 U.S.C. § 1983 for unconstitutional taking of personal property where the state provides an adequate post-deprivation remedy."). In other words, if the state provides an adequate remedy, plaintiff has no civil rights claim under § 1983. The State of Missouri provides the post-deprivation remedy of replevin for the recovery of personal property, Mo. R. Civ. P. 99.01-99.15, and a common-law remedy for conversion. *Hardesty v. Mr. Cribbin's Old House, Inc.,* 679 S.W.2d 343, 347 (Mo. Ct. App. 1984). *See also Knight v. M.H. Siegfried Real Estate, Inc.,* 647 S.W.2d 811, 814 (Mo. Ct. App. 1982).

Because plaintiff has failed to allege a deprivation of a constitutional right and the state provides a post-deprivation remedy for any unconstitutional taking of his personal property, the Court finds his claims against the defendants related to the denial or restriction of state-owned property or personal property should be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

## 2. Plaintiff's Allegations that He Should be Allowed a Least Restrictive Environment at SORTS

Plaintiff alleges that after a room search and ward search, he was reduced from a Green Level to a Red Level on February 14, 2022. He asserts that between February 18, 2022, and February 23, 2022, his room and/or area was searched eighteen (18) times because he was on "close observation," and he was placed on restrictions on February 23, 2022, including: no chewing gum; no watch; no batteries; no electronics; no clock; and no radio. Plaintiff was also limited from using the common property of his ward, including: the ward radio; ward hand-held games; and ward PlayStation. This was due to his inability to use electronics.

Plaintiff claims that he fell from Treatment Phase III to Treatment Phase I during this time. And he complains that dropping him from a Phase III Treatment Level to a Phase I Treatment Level was a loss of liberty interest.

The Supreme Court in *Youngberg v. Romeo*, 457 U.S. at 323, has made clear that when evaluating whether a civil detainee's due process rights have been violated, in deciding whether the care provided is adequate or whether the restraint is reasonable, the courts must defer to the decisions of professionals:

> the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision made by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such judgment.

*Youngberg*, 457 U.S. at 323. In short, those responsible for a civil detainee's care and treatment do not have to employ the best possible alternative or use the least restrictive means available. *See Thielman v. Leean*, 140 F.Supp.2d 982, 992 (W.D. Wisc. 2001) ("so long as [the] choice was made by a professional, it is presumptively valid even if it is not the best alternative"); *Collington v. Milwaukee County*, 163 F.3d 982, 990 (7th Cir. 1998) (mere disagreement about which of many professionally acceptable treatment plans should have been implemented does not make out a substantive due process claim).

Although plaintiff complains that his drop in treatment level was a deprivation of a liberty interest, the prevailing view is that there is no general federal constitutional right to a least restrictive environment. *See Kulak v. City of New York*, 88 F.3d 63, 73 (2d Cir. 1996) (citing *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1247-49 (2d Cir. 1984)); *P.C. v. McLaughlin*, 913 F.2d 1033, 1042 (2d Cir. 1990) ("The Constitution does not guarantee a mentally retarded person the right to live in the community of his choice or in the least restrictive environment."), accord *Lelsz v. Kavanagh*, 807 F.2d 1243, 1251 (5th Cir. 1987) ("[T]he federal constitution does not confer ... a right to habilitation in the least restrictive environment."); *Rennie v. Klein*, 720 F.2d 266, 268, 271 (3d Cir. 1983) (en banc) (plurality and concurring opinions) (acknowledging that Supreme Court declined to adopt a "least intrusive

means" analysis in *Youngberg*). *See also Conner v. Branstad,* 839 F. Supp. 1346, 1351 (S.D. Iowa 1993) ("Following the Supreme Court's decision in *Youngberg*, several circuits have uniformly concluded that there is no federal right to treatment in the least restrictive setting."); *Gieseking v. Schafer*, 672 F. Supp. 1249, 1266 (W.D. Mo. 1987) ("[T]he courts have uniformly rejected the notion that mentally retarded and developmentally disabled individuals have a constitutionally-founded right to receive treatment in the least restrictive alternative."); *Ass'n for Retarded Citizens of N. Dakota v. Olson*, 561 F. Supp. 473, 486 (D.N.D. 1982) ("Prior to the Youngberg decision, this court held that the Fourteenth Amendment secures a right to the least restrictive practicable alternatives to institutionalization. While the *Youngberg* decision does not directly address this specific right, the Court's analysis indicates that it would reject an absolute right to the least restrictive alternatives." (citations omitted), *aff'd* on other grounds, 713 F.2d 1384 (8th Cir. 1983).

"[A] state may create such a liberty interest protected under the Fourteenth Amendment by regulations, statutes, or court orders 'mandatory in character.'" *Kulak*, 88 F.3d at 73 (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)). Importantly, however, these state-created liberty interests are only "entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones*, 445 U.S. 480, 488 (1980). "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). But while a State-created liberty interest may be "entitled to the procedural protections of the Due Process Clause of the

Fourteenth Amendment," *Van Orden v. Stringer*, 937 F.3d 1162, 1168 (8th Cir. 2019) (emphasis in original; quoting *Vitek*, 445 U.S. at 488), cert. denied sub nom. *Orden v. Stringer*, 140 S.Ct. 1146 (2020), a state-created liberty interest cannot form the basis of a substantive due process claim. "Fundamental rights or liberties that are protected by substantive due process are those implicit in the concept of ordered liberty or derived from our Nation's history and tradition; they are not created by States." *Id.*

None of the Missouri State laws and regulations cited by plaintiff provide plaintiff with a liberty interest guaranteeing a least restrictive environment at SORTS. The record shows that he received several Behavior Worksheets for having Dangerous Contraband in his possession and as a result he suffered the loss of his status level from Green to Red and he then dropped from Phase III to Phase I in treatment levels.

Defendants' actions in issuing the Behavior Worksheets and reducing plaintiff's treatment levels cannot be found to be "arbitrary or purposeless" because such actions are part of "maintaining institutional security and preserving internal order and discipline," which the Supreme Court has identified as "essential goals that may require limitation or retraction of retained constitutional rights." *Bell v. Wolfish*, 441 U.S 520, 546-47 (1979). As such, defendants should be given "wide-ranging deference" in adopting and executing policies that they judge are needed to preserve institutional security. *Id.* at 547-48. *See also Coffman v. Blunt*, No. 4:05-CV-00373-RWS, 2005 WL 1474091, at *3 (E.D. Mo. June 22, 2005) (allegations which "fall into the category of mere disagreement over how civil detainees should be cared for and treated and do not indicate a complete lack of professional judgment necessary to show a due process claim ... should be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)"). As such, the Court finds it is

appropriate to dismiss plaintiff's due process arguments for a "least restrictive environment" pursuant to 28 U.S.C. § 1915(e)(2)(B).[7]

### 3. Plaintiff's Allegation that he is Entitled to the Creation of Specific Due Process Policies at SORTS

Plaintiff alleges in a conclusory manner that the defendants at SORTS should be liable for failing to promulgate "patient property protection policies," "search warrant protection policies," and other "patient property safeguards." He additionally claims that the Missouri Department of Mental Health is responsible for failing to "promulgate and publish policies regarding the legal and appropriate restrictions applicable for long-term residential hospital patients." Plaintiff alleges in a conclusory manner that defendants should have published policies for "strip searches" as well as policies for "evidentiary due process" hearings for detainees.

The essence of plaintiff's claim is that he wishes to have the Missouri Department of Mental Health and SORTS perform as he desires, publishing policies that he requests and which he believes conforms with the Due Process Clause. In that sense, he insists he has a substantive due process right to have such procedures available to him. But there is no indication that such policies as plaintiff requests, which would arise from State processes rather than Constitutional law, are necessitated by the Fourteenth Amendment. His argument once again confuses procedural due process and substantive due process, as set forth, *supra*.

Plaintiff has not identified a "fundamental" right or a State-created liberty interest that provides him the right to have such State-created policies that he seeks. Accordingly, the Court finds that plaintiff's claims that he is entitled to the creation of specific "due process" policies at

---

[7]The Court notes that plaintiff, at times, refers the week he was placed on 1 to 1 observation as "harassment." However, he has not provided the Court with any detailed allegations indicating that defendants acted in a manner that was harassment or unconstitutional.

SORTS and the Missouri Department of Mental Health are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

**4.   Plaintiff's Contention that he was Entitled to an Evidentiary Hearing Prior to Receiving the Behavior Worksheet**

Plaintiff asserts that he was entitled to an evidentiary hearing prior to receiving the Behavior Worksheets, removal of his status level from Green to Red and demotion of his treatment level from Phase III to Phase I. As described above, plaintiff was provided the opportunity to discuss the removal of his property prior to the issuance of the Behavior Worksheets with defendants, and he was also provided the opportunity to file grievances at SORTS through the grievance system. Additionally, the record shows that plaintiff received the Behavior Worksheets after it was revealed that plaintiff was concealing Dangerous Contraband in his room and on his person.

Involuntarily committed civil detainees like plaintiff retain "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training or treatment as may be required by those interests." *Youngberg*, 457 U.S. at 324. However, regarding the nature of the treatment, the state "enjoy[s] wide latitude in developing treatment regimens" for mental health patients. *Hendricks*, 521 U.S. at 368 n. 4. In short, those responsible for a civil detainee's care and treatment do not have to employ the best possible alternative or use the least restrictive means available. *See Collingnon*, 163 F.3d at 990 (finding that a disagreement about which of many professionally acceptable treatment plans should have been implemented does not make out a substantive due process claim). "[A] decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.

"[T]here exists no basis in the Due Process Clause or elsewhere in the Constitution for requiring that discipline not be imposed upon a pretrial detainee for violations of institutional discipline without the particular procedural mechanisms invoked by plaintiff here, including notice, a hearing or specific findings, a right to counsel, and an independent investigation of the charges." *Smith v. Copeland*, 892 F.Supp. 1218, 1233 (E.D.Mo.1995). "Only if ... the restriction or condition is 'arbitrary or purposeless'-is the action a punishment that violates Due Process if inflicted upon detainees." *Id.* at 1227 (quoting *Bell*, 441 U.S. at 539).

To the extent plaintiff argues that his demotion in treatment levels and status levels amounts to "discipline," this claim summarily fails because there is no evidence that such amounted to punishment proscribed by the Due Process Clause. *See id.* Plaintiff indicates that he was told by defendant Killian, his counselor, on February 14, 2022, that his behavior was like his prior poor behavior in 2018 when he had previously caused a fire by tampering with his batteries in his hand-held electronics, and that it appeared that he was not improving in following directions. Thus, it is clear that defendants' actions were taken to improve plaintiff's ability to follow SORTS' rules and regulations.

Plaintiff's due process claim also fails because he cannot establish that the procedures used by SORTS to issue the Behavior Worksheets constitute a substantial departure from accepted professional judgment. *See, e.g., Strutton v. Helms*, 2006 WL 2506029, *4, No. 4:04-CV-1735 CEJ (E.D. Mo August 28, 2006); *Bradford v. Shoffman*, 2006 WL 1391303, *5-6, No. 4:03-CV-1699 CDP (E.D. Mo. May 19, 2006). Although plaintiff personally disputes the propriety of the treatment decisions he was subjected to, he offers no competent evidence that the SORTS staff's judgment was such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the determinations were not based on such a judgment. *See Youngberg*, 457 U.S. at 323. When these presumptively valid treatment decisions

are combined with the undisputed fact that residents may request expungement of the violation or appeal its issuance through the grievance process, plaintiff cannot demonstrate that his due process rights were violated by the immediate issuance of a Behavior Worksheet. For these reasons, plaintiff's due process claims are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

5. **Plaintiff's Assertion that Defendants Violated His Due Process Rights by Strip Searching Him and Subjecting Him to Excessive Pat Down Searches**

Plaintiff alleges that he was subjected to due process violations by two strip searches and "excessive" pat down searches during an approximate seven-month period at SORTS.

Plaintiff first claims that he was subjected to a strip search on August 20, 2021, by defendant Chris Chamberlain. He states that defendant Chamberlain came to his room, along with Nurse Kindle and Social Worker Gegg, and told plaintiff that a fellow patient or staff member had indicated that plaintiff was concealing a flash/junk drive with music on it. Although plaintiff was first asked to consent to the search, he refused to do so. Plaintiff indicates, however, that he consented to the search after being told by Nurse Kindle that he could lose some of his treatment objectives if he failed to consent. These included being possibly put on Total Ward Restriction and purportedly losing the ability to maintain his job at SORTS. Accordingly, plaintiff consented to the search.

Plaintiff is not exactly clear as to the individuals in his room at the time of the search.[8] However, he is clear that he was the one tasked with removing his own clothing and lifting his own privates so that Chamberlain could check under them. When no contraband was found, plaintiff was "charted" as cooperating with the search and left alone.

---

[8]In parts of plaintiff's complaint, he asserts that up to seven individuals were in his room at the time of the search including defendants Chamberlain, Kindle, Gegg, Farmer, Cunningham and John Doe Security Aide.

On February 15, 2022, plaintiff claims that Security Chief Chamberlain, Security Aide Cunningham, Nurse Rebecca McCauley and Security Aide Steve Philbert called plaintiff to his room for a second strip search. Plaintiff states that at first, he refused to consent to the strip search, but when defendant Chamberlain indicated that force would be used if he refused to comply, he acquiesced and took off his shorts and underwear. Inside plaintiff's underwear was a packet of smokeless chewing tobacco. Again, there is no indication that defendant Chamberlain touched plaintiff's body at the time of the search, except for plaintiff's allegations of excessive force, which will be examined, *infra.*

Plaintiff has not indicated that he was touched during either strip search by one of the defendants. And he has failed to plead specific facts indicating that the searches were unreasonable. Plaintiff's strip search claims, to the extent they are being raised under the Fourth Amendment, must therefore be dismissed without prejudice.

"A search occurs under the Fourth Amendment when ... 'the government violates a subjective expectation of privacy that society recognizes as reasonable.'" *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (quoting *Kyllo v. United States*, 533 U.S. 27, 31-33 (2001)). "[I]nvoluntarily committed civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012) (citing *Serna v. Goodno*, 567 F.3d 944, 948-49 (8th Cir. 2009)). And "'[a]lthough an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner.'" *Id.* (quoting *Revels*, 382 F.3d at 874). To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559; accord *Serna*, 567 F.3d at 949, 952-56. "Courts must consider the scope of the particular

intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559; accord *Serna*, 567 F.3d at 952-53.

Plaintiff indicates that he ultimately consented to both strip searches by defendants. Additionally, the searches occurred in the privacy of his room at SORTS, and none of the defendants ultimately touched plaintiff during the search. *See Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 339 (2012) ("There also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees.").

Although he complains that he was "coerced" into the searches[9], he indicates that he understood the motivation behind the searches to be that defendants believed he was concealing forbidden items on his person on both occasions and that they needed to check his person to look for such items which could not be revealed by a wand search or pat down search, i.e., he was accused of concealing a flash drive as well as tobacco in his underwear. Moreover, there is no indication that the searches were done in a manner in which to humiliate plaintiff, as he does not indicate that embarrassing statements were made against him during the searches or that the searches were carried out in an abusive fashion. *See Brigham City v. Stuart*, 547 U.S. 398, 404, (2006) (citing *Wren v. United States*, 517 U.S. 806, 813 (1996)) (searches conducted in an "abusive" fashion are unreasonable); *See also Bell*, 441 U.S. at 560; *Florence*, 566 U.S. at 339, (noting concerns "about instances of officers engaging in intentional humiliation or other abusive practices").

---

[9]Plaintiff states that he was told he may be placed on Total Ward Restriction or lowed in his treatment levels if he did not consent to the search. Plaintiff does not, however, allege how a Total Ward Restriction imposed an unconstitutional restraint. For example, he does not allege how long the restriction could be imposed or any facts permitting the inference that a Total Ward Restriction would occur as a result of something other than a legitimate governmental objective. *See Bell*, 441 U.S. at 539 (being subjected to an administrative restriction or adverse condition does not amount to punishment invoking the due process clause if it is "reasonably related to a legitimate governmental objective," such as maintaining institutional order and safety).

Plaintiff does protest that he was briefly seen naked by Nurse McCauley and a female Security Aide during the searches, but the infrequent and casual observation, or observation at distance of a detainee undergoing a strip search, which is reasonably related to legitimate security needs cannot be found to be so degrading as to warrant court interference. *See, e.g. Grummett v. Rushen*, 779 F.2d 491, 494–95 (9th Cir. 1985); *Bagley v. Watson*, 579 F.Supp. 1099, 1103 (D.Or.1983); *Smith v. Chrans*, 629 F.Supp. 606 (C.D.Ill.1986); *Michenfelder v. Sumner*, 860 F.2d 328, 334 (9th Cir. 1988) (mere presence of female prison staff in the general vicinity of search likely did not violate the Fourth Amendment).

Last, it appears from the record that there was ample justification for the two searches as plaintiff admits he had prior history of having Dangerous Contraband. In 2018, he also was charged with having Dangerous Contraband and causing a fire as a result. The Government's interest in maintaining security at institutions providing the containment and treatment of civilly committed patients has been held crucial to safety as well as treatment. *Morgan v. Rabun*, 128 F.3d 694, 697 (8th Cir. 1997). Furthermore, the Court notes that, by definition, sexually violent predators are more likely to engage in predatory acts of sexual violence than other types of civil detainees. Mo. Rev. Stat. § 632.480 (2000). Due to their predatory nature and the threat of sexual violence, the confinement of sexually violent predators raises security issues that are different from those posed by other types of civil detainees. *Seling v. Young*, 531 U.S. 250, 261 (2001); *Hendricks*, 521 U.S. at 363. Given these facts, the Court cannot find that the search was done in such an unreasonable manner such that plaintiff's Fourth Amendment was violated. Furthermore, the Court notes that suspicion concerning the individual's conduct is "relevant to the analysis" of a Fourth Amendment issue in this context. *See Serna*, 567 F.3d at 951. As such, the Court finds that the strip searches of which plaintiff complains were not inherently unreasonable.

The Court will next turn to plaintiff's contentions regarding the pat searches. Although plaintiff argues in his complaint that he was subjected to "excessive" pat searches, he sets forth only three times that he was subjected to such searches. He claims that on August 20, 2021, he *agreed* to a pat search done by defendants Gegg, Chamberlain and Kindle with a portable security wand (metal detector), prior to the strip search. He claims that on February 10, 2022, defendant Chamberlain told an unnamed Security Aide to pat search him as he was returning from the yard, prior to allowing him to go to the restroom. This was prior to him receiving the Behavior Worksheet in the afternoon for having Dangerous Contraband. And on March 7, 2022, plaintiff was again "wanded" in his room by Security Aides Hoskins, Unknown Shawn, John Doe and Philbert to check to see if he was concealing the hearing aid batteries on his person.

Although plaintiff complains in his complaint that he has been subjected to numerous pat searches during the prior seven months at SORTS, he has not indicated any other times or other defendants who specifically engaged in those pat searches. *See Madewell v. Roberts,* 909 F.2d 1203, 1208 (8th Cir. 1990) (finding that liability under § 1983 requires a causal link to, and direct responsibility for, the alleged deprivation of rights).

To determine "reasonableness" in an institutional setting, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *Bell,* 441 U.S. at 558–9. In applying the balance test, a court must consider: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating the search; and (4) the place in which the search is conducted. *Id.* at 559; *Serna*, 567 F.3d at 949 (quoting the *Bell* balancing test). A court must defer to the judgment of the correctional (or institutional) official "unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of institutional security." *Arnzen,* 713 F.3d at 373 (quoting *Beaulieu,* 690 F.3d at 1029.

Plaintiff appears to argue that the pat searches were unconstitutional by the mere fact that they were conducted without a warrant. However, he misconstrues the test as required under the Fourth Amendment. The Court finds that plaintiff's assertions, as set forth above, regarding the pat searches are subject to dismissal.

As noted above, the factors this Court must consider in evaluating the intrusion alleged by plaintiff includes the justification, manner, location, and scope of the search. *Bell*, 441 U.S. at 559. This involves balancing the need for the pat search at issue against the intrusion upon plaintiff's personal rights. *See Goff v. Nix*, 803 F.2d 358, 364–66 (8th Cir. 1986) (applying *Bell* in prison context).

Regarding the August 20, 2021, wand search, plaintiff understood that defendants were looking for a concealed flash/junk drive and he consented to the search at that time. Moreover, he had previously been provided with a Behavior Worksheet for having Dangerous Contraband in 2018. On February 10, 2022, defendants had just found additional contraband in plaintiff's room, and they were seeking contraband on his person by doing a wand search after he returned from the yard. He was given a Behavior Worksheet later that afternoon listing the Dangerous Contraband found in his room. Additionally, on March 7, 2022, plaintiff knew that defendants were looking for missing hearing aid batteries. He had failed to turn in the hearing aids after finding them in the yard for a 24-hour period. After turning them in he was questioned as to why they were missing the batteries; thus, defendants were looking for the batteries and were doing an electronic search of plaintiff for contraband.

Although, this type of search, electronic wanding/pat down searches are not conducted privately, they are not highly intrusive. Similar searches performed in similarly non-private conditions have been found constitutionally reasonable. In fact, the Courts have found that far more invasive searches at sex-offender-treatment facilities were constitutional. *See Beaulieu*, 690

- 32 -

F.3d at 1030 (holding that unclothed body searches of patients before they leave their facility's secure perimeter did not violate the Fourth Amendment); *Serna*, 567 F.3d at 955 (holding that body cavity searches of involuntarily committed individuals did not violate the Fourth Amendment); *Semler v. Ludeman*, No. 09-732 ADM/SRN, 2010 WL145275, *20, (D.Minn. January 8, 2010). As such, plaintiff's search claims against the defendants are subject to dismissal under 28 U.S.C. § 1915(e)(2) for failure to state a claim upon which relief may be granted.

**6. Plaintiff's Assertion that His Due Process Rights Were Violated by Room Searches**

Plaintiff asserts that his due process rights were violated by "warrantless" room searches. He indicates that his room was searched on August 20, 2021, when he was accused of hiding a flash drive, and that his room was also searched on January 28, 2022, by defendants Jared Hoskins, John Doe Security Aide, and Security Aide Tony Morgan. Plaintiff also states that a "total ward search" was conducted on February 9, 2022, and at that time, his stereo was taken from his room. Last, plaintiff complains that his room was searched eighteen (18) times between February 18, 2022 and February 23, 2022 because he was on "close observation" during that time period. Plaintiff claims he does not know why he was on "close observation" during that time period. However, plaintiff fails to provide any details relating to the alleged eighteen times his room was searched during this one-week time period, such as who allegedly did the searches and when specifically, they occurred.

In *Arnzen*, the Eighth Circuit stated, "[N]either our court nor the Supreme Court has ever outlined exactly what expectation of privacy [involuntarily civilly committed persons and pretrial detainees] reasonably have, outside of our holding that detainees do not have a reasonable expectation of privacy in their jail cells." 713 F.3d at 372. Applying *Arnzen*, *Beaulieu*, and *Serna*, the Court in the District of Minnesota conducted a Fourth Amendment

analysis concerning whether a civilly committed individual had an objectively reasonable expectation of privacy in his room at the Minnesota Sex Offender Treatment Center. *See United States v. Senty-Haugen*, 17-CR-182 (JNE/LIB), 2017 WL 6543824, at *5-8, 12-13 (D. Minn. Nov. 21, 2017), adopting report and recommendation, 2017 WL 6550674 (D. Minn. Dec. 21, 2017). The Court observed that the Eighth Circuit "has clearly and repeatedly stated that the Fourth Amendment rights of those involuntarily civilly committed are diminished in scope," and "[ ]emphasized the long held precedent that a civil committee's expectation of privacy is the same as that of a pretrial detainee." *Id*. at *6, 12.

In light of Eighth Circuit percent, the Court "f[ound] no reason[ ] why the standard applicable to a pretrial detainee's expectation of privacy would differ from that of a MSOP civil committee." *Id.* at *12. The Court also noted that, in *Bell*, the Supreme Court "upheld the constitutionality of unannounced, warrantless room searches in a facility housing pretrial detainees reasoning that '[i]t is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure ...." *Id.* (quoting 441 U.S. at 56-57). Based on these authorities, the magistrate judge held that an involuntarily civilly committed individual at the Minnesota Treatment Center "ha[d] no objectively reasonable expectation of privacy in his room" and could not "claim any Fourth Amendment violation deriving from any search of that room." *Id.* at *13.

This Court agrees with the reasoning set forth in *Arnzen*, 713 F.3d at 372-73. "The Supreme Court has interpreted the Fourth Amendment as proscribing unreasonable searches that intrude upon a person's reasonable expectation of privacy." *Azam v. City of Columbia Heights,* 865 F.3d 980, 989 (8th Cir. 2017). Without a reasonable expectation of privacy, there is no Fourth Amendment claim. *See Azam,* 865 F.3d at 988-90; *Senty-Haugen*, 2017 WL 6543824, at *13; *Nelson v. Jesson*, No. 13-cv-340 (RHK/JJK), 2013 WL 5888235, at *5 (D. Minn. Nov. 1,

2013); *see also Gross v. Normand*, 576 F. App'x 318, 320 (5th Cir. 2014) (pretrial detainee unable to state a § 1983 claim based on the Fourth Amendment as "an inmate does not have an expectation of privacy in his cell"). A number of courts have previously addressed the constitutionality of various detainee policies under the Fourth Amendment. "[R]andom room searches at MSOP" have repeatedly survived Fourth Amendment scrutiny. *See Housman v. Jesson*, Civ. No. 15-2209, 2016 WL 7231600, at *3 (D. Minn. Dec. 14, 2016); *see also Daniels v. Jesson*, Civ. No. 13-736, 2014 WL 3629874, at *6 (D. Minn. July 22, 2014); *Semler,* 2010 WL 145275, at *22 (finding that random room searches at a sex-offender-treatment facility does not violate the Fourth Amendment). Therefore, plaintiff's claims for due process violations based on "warrantless" room searches are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 7.  Plaintiff's Allegation that the Grievance Policy at SORTS Violates His Due Process Rights

Plaintiff complains that SORTS has an "inexhaustible grievance procedure" because SORTS and the Missouri Department of Mental Health fail to exercise oversight over the grievance procedure and publish grievance procedure rules in line with due process. He further alleges that McIntyre "holds conflicting offices" and authorities at SORTS, as both the Grievance Coordinator, as well as the Patient Rights Advocate and Rights of the Individual Committee Chairperson, and this causes a conflict in his duties at SORTS. As a result, plaintiff argues that no appeals of grievances are allowed at SORTS, and he also alleges that defendants will not provide him with copies of all rules and regulations relevant to the grievance procedures, which he believes are "cobbled together" from several different standards and laws.

These allegations simply do not rise to the level of a constitutional deprivation and are legally insufficient to establish a denial of rights secured under the Constitution or laws of the United States. Plaintiff's claims are ultimately based on the denial of his grievance requests and his dislike with the fact that SORTS does not allow an appeal of their grievance procedure.

However, to state a cognizable claim under § 1983, a plaintiff must allege that the conduct of a defendant acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Hamilton v. Schriro*, 74 F.3d 1545, 1549 (8th Cir. 1996). There is no federal constitutional right to a grievance procedure, and neither a state law nor a state policy creates one. *See Poe v. Corizon Health,* 2019 WL 186660, at *4 (E.D. Mo. Jan. 14, 2019). Therefore, if a state entity, such as the Missouri Department of Mental Health or SORTS, elects to provide a grievance mechanism, violations thereof will not give rise to a § 1983 claim. *See Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir. 1993) (the grievance procedure is a procedural right only and confers no substantive right on an inmate); *Ingrassia v. Schafer*, 2012 WL 761143, at *7 (E.D. Mo. Mar. 8, 2012) (ruling against a [detainee] on an administrative complaint does not cause or contribute to the violation) (citing  *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) (citations omitted)); *see also Reynolds v. Lombardi*, 2013 WL 6134018, at *2 (E.D. Mo. Nov. 21, 2013) (claim that officials failed to respond to letters is legally frivolous).

To the extent plaintiff can be understood to claim that defendants violated SORTS or state regulations by not providing him with a copy of written institutional polices, such a claim also fails because there is no federally protected interest in having state officers follow state law or prison officials follow prison regulations. *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003); *see also Gardner v. Howard,* 109 F.3d 427, 430 (8th Cir. 1997) (failure to follow prison policy is not basis for § 1983 liability); *Bagley v. Rogerson*, 5 F.3d 325 (8th Cir. 1993) allegation of state law violation, statutory or decisional, does not, in itself, state a claim under federal Constitution or § 1983).

Because plaintiff has failed to allege a deprivation of a constitutional right, the Court finds this claim should be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B). *See Parratt v.*

*Taylor*, 451 U.S. 527 (1981) (to establish a prima facie case under § 1983, a plaintiff must allege that the action is a deprivation of a constitutional or federal statutory right).

### B. Excessive Force Claim as to Defendant Chamberlain in Violation of the Fourteenth Amendment

Plaintiff asserts that defendant Chamberlain's subjected him to excessive force during the course of a strip search on February 15, 2022. As noted above, plaintiff states that at first, he refused to consent to the strip search on that date, but when defendant Chamberlain indicated that force would be used if he refused to comply, he acquiesced and took off his shorts and underwear. Inside plaintiff's underwear was a packet of smokeless chewing tobacco. Defendant Chamberlain inspected the tobacco and dropped it on the floor near plaintiff's feet.

Plaintiff claims that he was told to lift his scrotum and penis, and at this point he was standing naked in front of Rebecca McCauley and noticed two patients looking through the window. He alleges that he "became uncomfortable," and "bent down and attempted to pick up his underwear on the floor." Plaintiff claims that when he bent down to grab his underwear, defendant Chamberlain "stomped" on plaintiff's right hand and pinned it to the floor until plaintiff jerked it out from under his foot. Although plaintiff indicated in his complaint that he was grabbing his underwear, he also grabbed the tobacco at the same time, as plaintiff admits in his complaint that he had the chewing tobacco in his hand at the time Chamberlain "stomped" on his hand. Plaintiff states that when he "snatched the smokeless chew in his hand" he asked Chamberlain, "What are you going to do now?"

Plaintiff's complaint is unclear as to how he became "forcibly pinned to the floor on his knees and forehead." He does not indicate that plaintiff Chamberlain pinned him to the floor, and he does not name another defendant that purportedly did so. Rather, he simply states in a conclusory manner that he was pinned, and pressure was put on his "neck and back." The Court will not consider the use of the alleged force on plaintiff's back and neck as plaintiff has not

indicated which defendant allegedly used force in that area. Accordingly, the review of defendant Chamberlain's use of force will only involve plaintiff's allegation that Chamberlain "stomped" on his hand when plaintiff reached for the tobacco and his underwear on the floor.

The Due Process Clause protects pretrial detainees from the use of excessive force amounting to punishment. *Kingsley v. Hendrickson*, 576 U.S. 389, 397-98 (2015). *See also Bell*, 441 U.S. at 535 (stating that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"); and *Smith v. Conway Cty., Ark.*, 759 F.3d 853, 858 (8th Cir. 2014) (stating that "the Due Process Clause prohibits any punishment of a pretrial detainee, be that punishment cruel-and-unusual or not"). Analysis of excessive force claims under the Due Process Clause focuses on whether the defendant's purpose in using force was "to injure, punish, or discipline the detainee." *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014). The Fourteenth Amendment gives pretrial detainees "rights which are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014). Indeed, pretrial detainees are afforded greater protection than convicted inmates in the sense that the Due Process Clause prohibits the detainee from being punished. *Id*.

"Whether the application of force is unreasonable turns on the facts and circumstances of each particular case." *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (internal quotations and citations omitted). "Factors relevant to assessing the objective reasonableness of force used by officers include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. (citing *Kingsley*, 576 U.S. at 397-98).

The Court takes notes that the only physical injuries listed by plaintiff in his complaint was a need for a few days of Ibuprofen for body aches for his *back and neck*. Although he states that he was ultimately allergic to the Ibuprofen and had to stop taking it after a few days, this factor is not relative to the excessive force analysis. However, the fact that plaintiff did not have a lasting physical injury to his hand, the injury pertinent to defendant Chamberlain, is relevant to the Court's analysis. *See Kingsley*, 576 U.S. at 397 (listing "the extent of the plaintiff's injury" among objective-reasonableness factors); *Crumley v. City of St. Paul, Minn.,* 324 F.3d 1003, 1007 (8th Cir. 2003) ("In addition to the circumstances surrounding the use of force, we may also consider the result of the force." (citations omitted)); *see also*, *Davis v. White,* 794 F.3d 1008, 1012 (collecting cases finding a necessity for more than de minimis injuries in order to overcome qualified immunity in excessive force claims).

The Court also takes note of the fact that plaintiff escalated the situation by reaching for contraband – the tobacco – the item that necessitated the strip search to begin with. His resistance required defendant Chamberlain to act in response, and it also raised the risk of injury to the other SORTS' defendants in the room, which in turn, justified the use of force to stop plaintiff from reaching for the contraband. Plaintiff again exacerbated the situation by taunting defendant Chamberlain in saying, "What are you going to do now?"  This does not appear to be a situation where defendant Chamberlain acted to discipline plaintiff, but rather Chamberlain acted in a manner to contain both plaintiff and the contraband. Plaintiff does not indicate that defendant Chamberlain went any further than stepping on his hand, and he has not specified that there were other defendants involved in the actions of the alleged force.

Appropriately deferring to the need of jail officials to preserve internal order and discipline and to maintain institutional security, the Court cannot say that defendant Chamberlain violated plaintiff's constitutional rights by stomping on his hand on February 15, 2022. Plaintiff's

claims for relief for excessive force are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

### C.  Deliberate Indifference to Serious Medical Needs in Violation of the Fourteenth Amendment

Plaintiff alleges that defendant Jane Doe Nurse failed to order a post-trauma assessment for plaintiff after his hand was stepped on by defendant Chamberlain, and he suffered an injury to his back. However, plaintiff has failed to articulate when he asked Jane Doe nurse for a trauma assessment, and what Jane Doe nurse told him.[10]

Plaintiff states that in the middle of the night on February 16, 2022, he attempted to get out of bed to use the restroom, and he "could hardly move." Plaintiff does not articulate his alleged injuries, merely stating that he was "straining to get up," and that he was unable to make it to the restroom. He claims he took what pain medication he had at the time, Excedrin, and he went back to bed. Early that morning he asked Nurse McCauley for pain medication, and she told him she would need a doctor's order to bring him oral medication. However, she ordered Ben-Gay for his back, which he would need to pick up at the medication window. Later that evening, Nurse McCauley filled out a medication request form for plaintiff to get oral pain medication for his back and hand. He was given the medication the next morning, February 17, 2022, at 5:15 a.m.

Plaintiff claims that he was seen by an unnamed nurse on February 17, 2022, and the nurse noted problems with swallowing. It was concluded it could be that he was allergic to the Ibuprofen he was taking for his back. Thus, on February 18, 2022, Nurse Hall notified medical and attempted to get a new medication for plaintiff. Plaintiff states that Nurse Dan Forsythe

---

[10] Plaintiff alleges that pictures of his hand were taken by defendant Cunningham at 8:05 a.m. on February 15, 2022. He complains that Nurse McCauley also failed to give him a trauma assessment, but he has failed to name Nurse McCauley as a defendant in this action.

checked with medical on the afternoon of February 18, 2022, regarding a substitution, but he did not hear back from him. As a result, plaintiff simply stopped taking the Ibuprofen and his swallowing issues stopped.

Plaintiff alleges that defendant Kathy Hammond has failed to respond to his request for treatment for his hand. However, he admits that defendant Hammond prescribed him 600 mg of Ibuprofen every 8 hours for pain at some point for pain because of the incident with defendant Chamberlain.

 "[W]here a [civilly-committed] patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment." *Mead v. Palmer*, 794 F.3d 932, 936 (8th Cir. 2015) (quotation marks and citation omitted); *Revels*, 382 F.3d at 874) (recognizing that Fourteenth Amendment applied to involuntarily committed patient's § 1983 claims but applying Eighth Amendment standards because patient's "confinement is subject to the same safety and security concerns as that of a prisoner"). Therefore, although plaintiff is not a prisoner, Eighth Amendment standards apply to his claim.

The Eighth Amendment deliberate indifference standard includes both an objective and a subjective component. Plaintiff must demonstrate that (1) he suffered from objectively serious medical needs, and (2) the defendants knew of, but deliberately disregarded, those needs. *See Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), as amended (Mar. 4, 2016). "A medical condition is 'objectively serious' if the prisoner was diagnosed by a doctor or it is so obvious that a lay person would recognize the medical need." *Id.* "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more ... than gross negligence. It requires a mental state akin to criminal recklessness." *Id.*

To prevail on a deliberate indifference claim, a plaintiff must prove that he suffered from an objectively serious medical need, and that defendants actually knew of and deliberately disregarded that need. *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).  A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quoted case omitted).

"[D]eliberate indifference requires a highly culpable state of mind approaching actual intent."  *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (quoted case omitted).  An inmate must demonstrate that a prison health care provider's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014) (quoted case omitted). Allegations of mere negligence in giving or failing to supply medical treatment will not suffice. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Nor will a prisoner's "mere disagreement with treatment decisions" support a claim of deliberate indifference.  *Jones v. Minn. Dep't of Corr.,* 512 F.3d 478, 482 (8th Cir. 2008).

The record clearly shows that once plaintiff sought medical care for the pain in his neck, hand and back, he was provided care for his pain. Thus, the Court cannot make a finding that defendants were deliberate indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment. Plaintiff's allegations of deliberate indifference are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

**D.  Plaintiff Fails to Establish a Conspiracy Claim for Lack of Due Process**

Plaintiff asserts that defendants have engaged in a conspiracy to deny him due process rights under the Constitution.

To state a § 1983 conspiracy claim against a defendant, the plaintiff must show the defendant conspired with others to deprive him of a constitutional right, at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy, and that the overt act injured the plaintiff. *Askew v. Millard*, 191 F.3d 953, 957 (8th Cir. 1999). A plaintiff must allege with "sufficient particularity" and demonstrate with "specific material facts" that the alleged conspirators reached some agreement and worked together. *Gometz v. Culwell*, 850 F.2d 461, 464 (8th Cir. 1988). Plaintiff must also allege "an actual deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *Askew*, 191 F.3d at 957. Because the Court has found that plaintiff's due process and deprivation of property claims do not establish constitutional violations and he has not alleged with particularity specific facts demonstrating an actual agreement between defendants, plaintiff's § 1983 civil conspiracy claim must also be dismissed for failure to state a claim. *Id.*

Plaintiff asserts that he was the subject of a conspiracy by defendants to prevent him from exercising his constitutional, statutory, and common law rights. Plaintiff alleges that the individual defendants are all employed by SORTS. "[A] government entity or corporation cannot conspire with itself." *Habhab v. Hon*, 536 F.3d 963, 969 (8th Cir. 2008) (citing *Barstad v. Murray County,* 420 F.3d 880, 887 (8th Cir. 2005)). "An exception arises when the agents were, at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit." *Barstad*, 420 F.3d at 887. However, plaintiff has not alleged or raised any facts from which it can be inferred that defendants acted "beyond the scope of their authority or for their own benefit." *See id*. Accordingly, plaintiff has further failed to plausibly allege the existence of a conspiracy. *See, e.g., Barstad*, 420 F.3d at 887. Based on the foregoing reasons, the Court finds that plaintiff's conspiracy claims fail under 28 U.S.C. § 1915(e)(2)(B).

**E. Plaintiff Fails to State Claims Against Missouri Department of Mental Health and the Supervisory Defendants**

Plaintiff names the Missouri Department of Mental Health, Southeast Missouri Mental Health Center, and two supervisory individuals as defendants in this action, including Chief Operating Officer Denise Hacker and Dr. Kimberly Bye. Dr. Bye and Denise Hacker are alleged to be employed by either the Missouri Department of Mental Health or the SORTS facility, which are departments or subdivisions of the State of Missouri.

The State of Missouri is not a "person" for purposes of 42 U.S.C. § 1983. That is, § 1983 only "provides for an action against a 'person' for a violation, under color of law, of another's civil rights." *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008). *See also Deretich v. Office of Admin. Hearings*, 798 F.2d 1147, 1154 (8th Cir. 1986) (stating that "[§] 1983 provides a cause of action against persons only"). However, "neither a State nor its officials acting in their official capacity are 'persons' under § 1983." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989). *See also Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017) (stating that a "State is not a person under § 1983"); and *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) (stating that "a state is not a person for purposes of a claim for money damages under § 1983").

Moreover, a claim against the State of Missouri is barred by the doctrine of sovereign immunity. "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). The Eleventh Amendment has been held to confer immunity on a nonconsenting State from lawsuits brought in federal court by a State's own citizens or the citizens of another State. *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). *See also Webb v. City of Maplewood*, 889 F.3d 483, 485 (8th Cir. 2018) ("The Eleventh Amendment protects States and their arms and instrumentalities from suit in federal court"); *Dover Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 446 (8th Cir. 1995) ("The Eleventh Amendment bars private parties from suing a state in federal court"); and *Egerdahl v.*

*Hibbing Cmty. Coll.,* 72 F.3d 615, 618-19 (8th Cir. 1995) ("Generally, in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment").

Neither exception applies in this case. First, there is no congressional abrogation of Eleventh Amendment immunity. Plaintiff brings this action pursuant to § 1983 and the United States Supreme Court has determined § 1983 does not revoke the States' Eleventh Amendment immunity from suit in federal court. *See Will*, 491 U.S. at 66 ("We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent"); *Quern v. Jordan*, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe . . . that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States"). Second, the State of Missouri has not consented to the suit. Specifically, the State's statutory waiver of immunity does not include the type of claims made by plaintiff in this case. *See* Mo. Rev. Stat. § 537.600.

Although plaintiff has sued for injunctive relief in this action, he has not alleged that defendants are liable under their official capacities. *See Monroe v. Arkansas State Univ.,* 495 F.3d 591, 594 (8th Cir. 2007) (explaining that for purposes of the Eleventh Amendment, a state official may be sued in an official capacity for prospective injunctive relief). Additionally, plaintiff has not demonstrated the State of Missouri's liability for any constitutional violation. Accordingly, plaintiff's claims against these defendants are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

## F. Plaintiff's Supervisory Claims Against Defendants/Failure to Train Theory

Plaintiff alleges that several of the defendants are liable in this action as "direct supervisors" and "should have known[] that they are responsible for training the staff in their facilities" regarding due process. He additionally claims that the Missouri Department of Mental

Health is responsible for failing to "promulgate and publish policies regarding the legal and appropriate restrictions applicable for long-term residential hospital patients." Plaintiff holds supervisory defendants Hacker, Killian, Gegg, Nohren, Chamberlain and McIntyre.

Defendant further alleges, in a conclusory manner, that defendants Bye, Killian and Hacker should be held liable under a "failure to train" theory for his alleged strip searches because he believes that the strip searches were carried out without disregard for due process. He also alleges that defendants Hacker, Killian and Chamberlain should be held responsible under a "failure to train" theory for failing to train subordinates under them with respect to "evidentiary due process" hearings, rather than taking privileges away through internal memoranda, vocal directives or unpublished policies.

To the extent plaintiff is alleging defendants are liable solely because they held administrative or supervisory positions, such claims are subject to dismissal. *See Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995) (respondeat superior theory inapplicable in § 1983 cases). Supervisors like defendants Bye, Hacker, Killian, Gegg, Nohren, Chamberlain and McIntyre cannot be held vicariously liable under § 1983 for the actions of a subordinate. *See Iqbal,* 556 U.S. at 676. To state a claim, the plaintiff must plead that the supervising official, through his or her own individual actions, has violated the Constitution. *Id.* Where, as here, the alleged constitutional violation requires proof of an impermissible motive, the complaint must allege adequately that the defendant acted with such impermissible purpose, not merely that he knew of a subordinate's motive. *Id.*

The Court notes that each of plaintiff's contentions have been addressed individually above. For example, the Court has already found that plaintiff's due process rights were not violated with regard to the strip searches, pat searches, room searches, and use of grievance procedures. The Court has additionally found that plaintiff's due process rights were not violated

when defendants failed to turn over policies plaintiff sought from defendants, and his constitutional rights were not violated when he was not provided additional procedural mechanisms prior to being given his Behavior Worksheets by defendants.

A supervisor is liable for the actions of his subordinates under § 1983 only if he personally participates in the alleged unconstitutional conduct, or when there is a causal connection between his actions and the alleged constitutional deprivation. *See Glick v. Sargent*, 696 F.2d 413, 415 (8th Cir. 1983) (warden must play a personal role in the disciplinary process; he cannot be held liable for the outcome of the process). Plaintiff has failed to plead specific facts establishing an actual link or connection between these defendants and the alleged constitutional violation, as set forth above. *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (to be cognizable under § 1983, a claim must allege that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights).  Thus, plaintiff fails to state a claim against these supervisory defendants for a violation of his constitutional rights. These claims are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

### G.  Request for Injunction

Plaintiff seeks a temporary restraining order from this Court requesting that defendant Chamberlain have "no contact" with him.  He also seeks declaratory relief seeking a finding from this Court indicating that defendants violated his due process rights by conducting warrantless searches of his room and person, seizing his property, and "implementing punitive restrictions" against him. Plaintiff further seeks a finding from this Court that the supervisory defendants failed to adequately train their subordinates in carrying out their duties.

Plaintiff additionally seeks an order from this Court that Missouri Department of Mental Health employees wear body cameras when conducting searches, fill out chain of custody

receipts, obtain proper search warrants, establish due process hearings for processing behavior worksheets, including a right to appeal findings, provide residents at SORTS a least restrictive environment, and replace detainees seized and/or damaged property. Plaintiff also asks for a mandatory injunction as to how rules and policies are to be promulgated at SORTS. Given the Court's dismissal of plaintiff's claims in this lawsuit, plaintiff's request for injunction will be denied as moot.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion to proceed in forma pauperis [ECF No. 2] is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B).

**IT IS FURTHER ORDERED** that plaintiff's motion for appointment of counsel [ECF No. 3] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that plaintiff's request for injunction is **DENIED AS MOOT**.

**IT IS HEREBY CERTIFIED** that an appeal from this Order would not be taken in good faith.

A separate Order of Dismissal shall accompany this Memorandum and Order.

Dated this 28th day of October, 2022.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE